**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VINCENT C. BRUCE,<br><br>        Plaintiff,<br><br>    v.<br><br>JEANNE WOODFORD, et al.,<br><br>        Defendants. | Case No.: 1:07-cv-00269-BAM PC<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 168)<br><br>ORDER DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 188)<br><br>ORDER REGARDING PLAINTIFF'S OBJECTIONS TO AND MOTION TO STRIKE DEFENDANTS' EVIDENCE<br>(ECF No. 194)<br><br>ORDER REGARDING PLAINTIFF'S MOTION TO STRIKE DECLARATIONS<br>(ECF No. 223) |

## I.      Introduction

Plaintiff Vincent C. Bruce ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action pursuant to 42 U.S.C. § 1983. This action currently proceeds on Plaintiff's claims against Defendants Adams, Hense, Ward, Clark, Fulks, Wan, Frauenheim, Lloren, Field and Tripp for retaliation in violation of the First Amendment; Defendants Adams, Hense, Ward, Clark, Fulks, Wan,

1

Lloren, Field and Tripp for violation of the Due Process Clause of the Fourteenth Amendment; and Defendants Adams, Schottgen and Field for failing to provide Plaintiff with adequate clothing in violation of the Eighth Amendment. All parties have consented to magistrate judge jurisdiction. (ECF Nos. 4, 104.)

Defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that the undisputed facts show that they did not violate Plaintiff's constitutional rights, and show that they are protected by qualified immunity. Fed. R. Civ. P. 56. (ECF No. 168.) Plaintiff opposed the motion, and also filed a cross-motion for summary judgment on all of his claims, (ECF No. 188). These motions are fully briefed and deemed submitted. Local Rule 230(l). The parties also filed documents regarding the evidence submitted in support of the summary judgment motions, including objections and motions to strike each other's' evidence. (ECF Nos. 194, 223.) Those motions have also been fully-briefed, so the Court finds them submitted, and addresses them below, as necessary. Local Rule 230(l).

## II.    Legal Standards

### A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, the court is to liberally construe the filings and motions of pro se litigants. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotations and citations omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.

2

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.

In arriving at the findings and rulings in this opinion, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**B.    Evidentiary Objections**

The parties have raised numerous objections to the evidence submitted by each other in support of these motions. As noted above, not every objection will be addressed by the Court individually, as doing so is neither necessary nor is that the practice of this Court in the summary judgment context. For the sake of clarity and to the extent it is appropriate, certain individual objections have been addressed by the Court below. Other objections are better dealt with here, in general terms.

Any objections to official prison records for lack of authentication are overruled. Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC v. Nehme, 632 F.3d 526, 532–33 (9th Cir. 2011). The records are subject to authentication under Rule 901(b)(6), and the Court notes the absence of any evidence or argument suggesting the existence of a legitimate challenge to the records on authentication grounds. See Chamberlain v. Les Schwab Tire Center of California, Inc., No. 2:11–cv–03105–JAM–DAD, 2012 WL 6020103, at *2 (E.D. Cal. Dec. 3, 2012) (citing Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006)) (rejecting "purely procedural" authentication objection).

The hearsay objections are also overruled. Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial. Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter

asserted, then the statement is not hearsay." Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004). At this stage, the Court did not find the hearsay objections raised by the parties to be preclusive of the evidence submitted.

Finally, given the Court's duty to determine whether there exists a genuine dispute as to any material fact, objections to evidence as irrelevant are both unnecessary and unhelpful. E.g., Carden v. Chenega Sec. & Protections Servs., LLC, No. CIV 2:09–1799 WBS CMK, 2011 WL 1807384, at *3 (E.D. Cal. May 10, 2011); Arias v. McHugh, No. CIV 2:09–690 WBS GGH, 2010 WL 2511175, at *6 (E.D. Cal. Jun. 17, 2010); Tracchia v. Tilton, No. CIV S–062916 GEB KJM P, 2009 WL 3055222, at *3 (E.D. Cal. Sept. 21, 2009); Burch, 433 F.Supp.2d at 1119.

## III.   Undisputed and Disputed Material Facts

Plaintiff is a state inmate currently serving a term of life without parole, who was housed at the Substance Abuse Treatment Facility and State Prison ("SATF") in Corcoran, California, at all times relevant to this litigation. (Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s Undisputed Facts"), ECF No. 192, ¶¶ 1-2.) At all relevant times, Defendants were working at SATF in the following capacities: Defendant Adams as Warden; Defendants Clark, Hense, and Ward as Associate Wardens; Defendant Fulks as a Correctional Captain and an Associate Warden; Defendant Frauenheim as a Correctional Counselor II Specialist and Supervisor; Defendants Field, Lloren, and Schottgen as Correctional Lieutenants; Defendant Wan as a Correctional Lieutenant who was promoted to Facility Captain; and Defendant Tripp as a Correctional Officer. (Id. at ¶¶ 3-13.)

### A.   Hunger Strike and Plaintiff's Placement in Administrative Segregation

The parties agree that, on February 27, 2004, Plaintiff and a group of inmates at SATF began a hunger strike. (Pl.'s Undisputed Facts ¶ 15). According to Plaintiff, the hunger strike was a peaceful protest against certain conditions at SATF, including:  the elimination of vocation and education classes, inmate jobs, and job training; the reduction of job hours; not allowing inmates to report to job assignments; the denial of religious services to African-American inmates; visiting restrictions; the unreasonable denial of indoor and outdoor recreation activities; and other conditions. (Pl.'s First Decl., ECF No. 190, ¶ 4.) Plaintiff alleges that these restrictions and conditions prevented inmates from rehabilitating themselves, and deprived them of opportunities to earn good conduct credits and

decrease their sentences. (Id. at ¶ 5.) Plaintiff, along with other inmates, allegedly engaged in the strike to protest these conditions after other tactics, such as grievances and meetings with prison officials, had not improved their situation. (Id. at ¶¶ 7-8.)

The parties dispute many of the facts regarding what occurred after the hunger strike began. Defendants contend that shortly after the strike started, prison officials received information from a confidential informant who alleged that Plaintiff and other inmates were engaged in a conspiracy to assault staff. (Defs.' Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' Undisputed Facts"), ECF No. 168-2, ¶ 16.) In support of this assertion, Defendant and then-Warden Adams submitted a declaration stating under penalty of perjury that he and his staff received such information. (Decl. of Adams ("1st Adams Decl."), ECF No. 168-4, ¶ 8.) Defendants Clark, Frauenheim, Fulks, Tripp, and Wan also submitted declarations under penalty of perjury stating that the prison officials received this confidential information concerning Plaintiff. (Decl. of Clark, ECF No. 169, ¶ 5; Decl. of Frauenheim, ECF No. 168-8, ¶ 4; Decl. of Fulks, ECF No. 168-9, ¶ 6; Decl. of Tripp, ECF No. 168-16, ¶ 5; Decl. of Wan, ECF No. 168-17, ¶ 7.) Defendants further contend that, on the basis of the confidential informant's allegations, Plaintiff was placed in administrative segregation on February 29, 2004, pending an investigation into the allegations. (1st Adams Decl.¶ 10; Decl. of Clark ¶ 7; Decl. of Frauenheim ¶ 5; Decl. of Fulks ¶ 7; Decl. of Wan ¶ 8.)

Plaintiff agrees that he was placed in administrative segregation on February 29, 2004, and that he was provided a notice of placement in administrative segregation, CDC Form 114-D, stating that the placement was based on allegations that he was involved in a conspiracy to assault staff. (Decl. of Fulks ¶ 8; CDC Form 114-D dated Feb. 29, 2004, ECF No. 168-9, p. 6; Pl.'s Undisputed Facts ¶¶ 17-18.) The form states that Plaintiff would be retained in administrative segregation pending review by the Institutional Classification Committee ("ICC") at the "direction of the warden." (CDC Form 114-D dated Feb. 29, 2004, ECF No. 168-9, p. 6.) Defendant Fulks further declares that after Plaintiff was placed in administrative segregation, he, as Acting Associate Warden, reviewed and signed off on the placement notice, as reflected on the CDC Form 114-D. (Decl. of Fulks ¶ 8.)

Although Plaintiff agrees he was placed in administrative segregation and received the above-described notice, he argues that the conspiracy allegations which Defendants claim were the reason he

was placed in administrative segregation, were pretextual. According to Plaintiff, the Defendants fabricated both the confidential investigation report and the conspiracy allegations against him. (Pl.'s Undisputed Facts ¶ 16.) He specifically alleges that "no such memorandum ever existed, nor any such information alleging [his] involvement in a conspiracy to assault staff." (Id.)

Plaintiff contends that the true reason he was placed into administrative segregation was to retaliate against him for his participation in the hunger strike, including for being one of the organizers of the strike and refusing to use his influence to stop it, and as an attempt to intimidate the strike participants to cease striking. (Pl.'s Undisputed Facts ¶ 17.) In support, Plaintiff submits a CDC 128G form dated March 24, 2004 authored by Classification Staff Representative ("CSR") M. Scott. (Pl.'s First Decl., ECF No. 190, Exh. C, p. 29.) A notation on that form states, in pertinent part, that Plaintiff was allegedly placed in administrative segregation based on allegations he was involved in a conspiracy to assault staff as set forth in a February 29, 2004 confidential report authored by Correctional Officer Patten ("Patten Report"). However, the notation goes on to state that at the time of CSR Scott's review, the Patten Report was not contained in the relevant investigation file or the central file.

Plaintiff also submitted his own declaration signed under penalty of perjury in support of his allegations of retaliation. Plaintiff declares that on the morning of the hunger strike, Defendant Fulks summoned Plaintiff and three other inmates to a meeting with Fulks and Defendant Wan to discuss the strike. (Pl.'s First Decl. ¶ 9.) Plaintiff declares that he and these other inmates were elected representatives who present inmate concerns and complaints to the warden and other officials as part of a Men's Advisory Council ("MAC"). (Id. at ¶¶ 6, 9.) Defendant Fulks asked Plaintiff and the other MAC representatives to represent the hunger strike participants by presenting the inmate complaints, and to communicate the position of the officials to them. (Id.) Defendant Fulks stated there would be no retaliation against Plaintiff for acting as a spokesperson regarding the strike, and Defendants Fulks and Wan told Plaintiff he and the other inmates were breaking no rules by having a hunger strike, as long as it remained peaceful. (Id. at ¶ 10.) Defendants Fulks and Wan specifically told Plaintiff he would not receive any rules violation reports or be placed in administrative segregation. (Id.) Defendants Fulks and Wan also conferred with Defendant Clark on the telephone in Plaintiff's

1   presence, and then Defendant Fulks stated that normal program would be run "as you guys are only

2   refusing food." (Id. ¶ 11.) Plaintiff and the three other inmates assured Defendant Fulks that the protest

3   was peaceful, and that no one would refuse staff orders. (Id.)

4          According to Plaintiff, he and Defendants Fulks and Wan discussed the inmates' grievances,

5   and complaints, and Plaintiff provided those Defendants a list of written grievances, but Fulks and

6   Wan stated that no actions would be taken at that time. (Pl.'s First Decl. ¶¶ 12-13.) Defendant Fulks

7   then insisted that Plaintiff and the other inmates use their influence to stop the hunger strike, or "there

8   would be 'repercussions.'" (Id. at ¶13.) Plaintiff and the other inmates reminded Defendant Fulks of

9   his promise of no retaliation, and Fulks responded "alright." (Id.) Plaintiff and the others negotiated

10  between the strike participants and prison officials. The strike participants opted to continue the strike,

11  and Defendant Fulks stated that:  normal program would run; the participants would be medically

12  evaluated on March 1, 2004; possible force-feeding by court order could take place; and there would

13  be another meeting on March 1, 2004. (Id. at ¶¶ 14-15.) Defendants Fulks and Wan repeatedly assured

14  Plaintiff and the inmates that it was not against the rules to organize or lead a hunger strike, or to

15  protest or complain through a hunger strike. (Id. at ¶ 16.) Nevertheless, Plaintiff was concerned about

16  retaliation. (Id.)

17         On February 28, 2004, the day after the strike started, the Fresno Bee published an article

18  about the hunger strike. (Pl.'s First Decl., ECF No. 190 Exh. B, p. 27.) The next day, February 29,

19  2004, prison officials turned off all inmate telephones for the duration of the hunger strike.[1] (Pl.'s First

20  Decl. ¶ 17.) Plaintiff was also escorted to a program office that day, and held in a holding cage for

21  several hours. (Id. at ¶ 18.) Plaintiff saw Defendants Fulks, Adams, Clark and other officials have a

22  meeting in an office in the program area. (Id.) Defendant Fulks then visited Plaintiff and told him, and

23  two other inmates who had been placed in holding cages near him, that "[w]e are going to turn it up a

24  notch." (Id. ¶19.) Defendant Fulks then ordered for Plaintiff and the other inmates to be placed in

25  administrative segregation, at which time thsee inmates were medically evaluated. (Id. at ¶¶ 19-20.)

26

27  _____
    [1]      Plaintiff asserts that the telephones were turned off to prevent communication with the media.

28  Defendants do not dispute that the telephones were turned off, but deny Plaintiff's allegation of the reason why.
    (Defs.' Objs. to Pl.'s Proposed Evid., ECF No. 209, p. 2 ¶ 1.)

Defendant Lloren was instructed by Defendants Adams, Clark, and others to tell the other inmates involved in the hunger strike that if it continued, the inmates would be transferred to Pelican Bay State Prison. (Decl. of Lloren, ECF No. 168-12, p. 5.) One of the striking inmates, Greenfield, declares that he was specifically informed that Plaintiff and two others were locked up in administrative segregation, were forced to send their property home, were on their way to Pelican Bay State Prison, and the other inmates would receive similar treatment if they did not cease the strike. (Decl. of Alexander Elton Greenfield, ECF No. 198, p. 98 ¶ 4).

## B.     Investigation and Plaintiff's Retention in Administrative Segregation

The parties agree that after Plaintiff was placed in administrative segregation, the Investigative Services Unit ("ISU") of SATF investigated the conspiracy allegations against him. (Pl.'s Undisputed Facts ¶ 17.) The results of the investigation were periodically reported to prison officials, including Defendants Adams, Fulks, and Wan. (Pl.'s Undisputed Facts ¶ 21.) Furthermore, while Plaintiff was held in administrative segregation, he was also periodically brought before the ICC. Although not recorded in the reports of the ICC meetings discussed below, Plaintiff declares that during at least two of these meetings, prison officials mentioned as a factor in his retention in administrative segregation his "willingness to take on issues for other inmates." (Pl.'s First Decl. ¶ 76.) Plaintiff understood this to be a reference to his jailhouse lawyer activities, including his assistance to other inmates with their exhaustion of administrative remedies. (Id.)

Plaintiff was brought before the ICC for his initial review on March 10, 2004, and Defendant Ward participated in that meeting. (Pl.'s Undisputed Facts ¶¶ 26, 27.) The ICC elected to retain Plaintiff in administrative segregation for ninety (90) days pending the investigation of the conspiracy-to-assault-staff allegations against Plaintiff, and also noted Plaintiff's history of predatory behavior and violence towards other inmates.[2] (Id. at ¶ 28; Decl. of Ward ¶ 8.) As discussed above, on March 24, 2004, CSR Scott reviewed the ICC's report from the March 10, 2004 meeting and other files, and

---

[2]     Plaintiff's objections to the evidence of the ICC's consideration of his history as irrelevant, misleading, and more prejudicial than probative are overruled. (Pl.'s Objs. to and Mot. to Strike Defs.'s Evid, ECF No. 194, at p. 2 ¶ B.) The evidence is relevant to Plaintiff's claims that he was wrongfully detained in administrative segregation, and he admits that the ICC considered evidence of his involvement in a 1998 battery-on-an-inmate incident.

1  noted that the Patten Report used to support Plaintiff's placement in administrative segregation was
2  not available in the investigative or central file. (3/24/04 CSR Action Report, Decl. of Frauenheim,
3  Exh. A, ECF No. 168-8, p. 9.)

4      According to a report by Defendant Wan ("4/2/04 Report"), "[o]n Friday, April 2, 2004,
5  Facility C concluded the investigation into the hunger strike that involved the Black inmates[,]"
6  including Plaintiff. (4/2/04 SATF-03-04-02-0074 Incident Report, Decl. of Wan, Exh. A, ECF No.
7  168-17, p. 10). The 4/2/04 Wan Report further states that Plaintiff was found to be one of the
8  organizers of the hunger strike, and would receive a rules violation report for the specific act of
9  "inciting a hunger strike." (Id.) Plaintiff contends that he did not think a hunger strike was prohibited
10 because in 2001, he participated in a 1,000-person hunger strike at Pelican Bay State Prison, and no
11 one was disciplined, including the organizer/leader. (Pl.'s First Decl. ¶ 40.)

12     On April 13, 2004, Defendant Tripp wrote Rules Violation Report ("RVR"), Log No. C-04-04-
13 012, and charged Plaintiff with "Inciting a Hunger Strike." (Pl.'s Undisputed Facts ¶ 35; RVR, Decl.
14 of Tripp., ECF No. 168-16, Exh. A, p. 5; Decl. of Lloren, ECF No. 168-11, Exh. B, p. 10.) The RVR
15 states that the strike was to consist of several stages, including a peaceful strike, a class action inmate
16 appeal, boarding up cell windows and a physical confrontation with the staff during cell extractions,
17 and a sit-down strike with an assault on staff when the inmates would be forced to return to their
18 housing unit. In support of this information, the RVR cites the Patten Report. (Id.)

19     The RVR also states, based on other confidential information, that Plaintiff was one of the
20 organizers of the hunger strike, and he approached others to participate in the strike, as well as
21 pressured African-American inmates to participate in the strike. (Decl. of Lloren, ECF No. 168-11,
22 Exh. B, p. 10.) The RVR also states that a gang investigator found that Plaintiff admitted that he was
23 approached to organize the strike by other inmates, and the purpose of the strike was to gain the
24 attention of the administration and to get media attention through the strike. Other sources revealed
25 that Plaintiff instructed his fiancée to organize a picket at SATF on February 29, 2004. Finally, the
26 RVR discussed that additional medical staff was assigned to deal with the strike, that refused meals
27 were disposed of, that modified program was required, staff was re-distributed for escort and security
28 duties, and non-involved inmates also had their program affected by the strike. (Id.) The RVR was

reviewed by Correctional Sergeant Gallagher, and classified as a serious offense by Defendant Schottgen. (Decl. of Tripp., ECF No. 168-16, Exh. A, p. 5.)

The next day, April 14, 2004, Plaintiff appeared before the ICC. (Pl.'s Undisputed Facts ¶ 29.) The ICC requested a 90-day extension of Plaintiff's retention in administrative segregation on the grounds that the investigation of the conspiracy-to-assault-staff allegation was ongoing. (Id. at ¶ 30; Decl. of Frauenheim ¶ 10.) The extension was approved. (April 14, 2004 CDC 128G, Decl. of Frauenheim, Exh. A, ECF No. 168-8, p. 10.) The ICC also noted that in March 2004, CSR Scott had noted that the Patten Report was not available, but at this time, a confidential Patten Report was now located in the central file. (Id.) The ICC further noted that the Patten Report had a date correction from February 29, 2004 to March 9, 2004. (Id.)   A few days after the ICC hearing, on April 16, 2004, Plaintiff was served with the RVR. (Pl.'s First Decl. ¶ 31.)

On May 14, 2004, Plaintiff appeared before Lieutenant Beeler for a disciplinary hearing, but the hearing was postponed. (Pl.'s First Decl. ¶ 41.) Plaintiff next appeared before the ICC on May 26, 2004, and Defendants Wan and Frauenheim participated in that meeting. (Pl.'s Undisputed Facts ¶ 31.) The ICC again requested an additional 90-day extension of Plaintiff's retention in administrative segregation on the grounds that the investigation into the conspiracy-to-assault-staff-allegations was still ongoing, and the extension was approved. (Id. at ¶ 32.; Decl. of Frauenheim ¶ 10; Decl. of Wan ¶ 15; May 26, 2004 CDC 128G, Decl. of Frauenheim, Exh. A, ECF No. 168-8, pp. 11-12.)

## C.     End of Investigation and Plaintiff's First Hearing

By July 2004, the investigation into whether Plaintiff had been involved in a conspiracy to assault staff had been officially concluded. The parties agree that the investigation ultimately indicated that there was insufficient information to substantiate a charge of conspiracy to assault staff against Plaintiff. (Pl.'s Undisputed Facts ¶ 22.) The parties also agree that information from the investigation revealed Plaintiff was one of the leaders of the hunger strike. (Id.)

On July 29, 2004, Defendant Lloren conducted a hearing on the charge against Plaintiff of "Inciting a Hunger Strike." (Pl.'s Undisputed Facts ¶ 36.) Plaintiff pleaded not guilty to the charge, (Pl.'s First Decl. ¶ 48), but Defendant Lloren found Plaintiff guilty, (Pl.'s Undisputed Facts ¶ 36). Defendant Lloren prepared the portion of the RVR related to the hearing, and submitted it for review.

(Decl. of Lloren ¶¶ 8-9.) Defendant Lloren could not assess Plaintiff any loss of credits despite finding Plaintiff guilty of inciting a hunger strike, because the hearing on those charges was not held within the required time frame.[3] (Id. at ¶ 7.)

The parties dispute the reason why the hearing was not held until July 2004. They agree that the ISU reported to Defendant Adams in March 2004 that it had completed its investigation into Plaintiff's alleged involvement in a conspiracy to assault staff. (Pl.'s Undisputed Facts ¶ 20; Decl. of Adams in Supp. of Defs.' Reply ("2nd Adams Decl."), ECF No. 207-1, ¶¶ 4-7, 9). Therefore, Plaintiff argues that any hearing should have occurred shortly thereafter, and the delay in his hearing and retention in administrative segregation during the delay was retaliatory. (Pl.'s Undisputed Facts ¶ 23.)

Defendants contend that although the ISU's investigation ended in March 2004, the ISU did not formally conclude the investigation by issuing a Form 128-B at that time, which prevented the ICC from finding that the investigation was complete, and further prevented it from changing its recommendation to retain Plaintiff in administrative segregation. (Id. ¶¶ 10-11.) Defendants contend that the investigation was formally concluded sometime in July 2004, and Plaintiff's hearing followed shortly thereafter. (See Decl. of Lloren ¶ 7; see also 1st Adams Decl.¶ 12.) Specifically, they contend that sometime in July 2004, Defendant Frauenheim was reviewing documents and reports from the investigation, and became aware that it was complete, but that the Form 128-B had not yet issued. (Decl. of Frauenheim in Supp. of Defs.' Reply ("2nd Frauenheim Decl."), ECF No. 207-3, ¶ 17.) Therefore, on July 26, 2004, Defendant Frauenheim issued a Form 128-B, formerly closing the investigation.[4] (Id.)

---

[3]      The RVR also contains Defendant Hense's typed name as the Chief Disciplinary Officer reviewing the RVR. (RVR, ECF No. 168-11, Exh. B, p. 7.) However, Defendant Hense contends that the name was pre-printed on the RVR, and it was actually reviewed and signed by then-Acting Associate Warden Ron Hanson, whose signature appears above Defendant Hense's typed name. (Decl. of Hense ¶ 5.)

[4]      Plaintiff moves to strike the portions of Defendant Adams' and Defendant Frauenheim's declarations discussing the formal conclusion of the investigation as sham affidavits. He argues that these additional declarations contradict the declarations originally submitted with Defendants' motion for summary judgment in which Defendants discussed the investigation ending in July 2004, and further argues that the additional declarations also reveal policy violations. (ECF No. 223, pp. 6-7.) Therefore, Plaintiff contends that they should be stricken. This motion to strike is denied. The additional declarations do not contradict the prior declarations, but merely clarify the prior testimony. Van Asdale v. Int'l Game Tech., 577 F.3d 989, 999 (9th Cir. 2009) (non-

Plaintiff next appeared before the ICC on August 18, 2004. Defendants Clark and Frauenheim participated in that ICC meeting. (Pl.'s Undisputed Facts ¶ 33.) At the August 18, 2004 ICC meeting, the ICC noted that the investigation of the conspiracy-to-assault-staff allegations had been concluded, and that there was insufficient information to substantiate a charge on those allegations. (Id. at ¶ 34.) The ICC also discussed the RVR against Plaintiff of inciting a hunger strike, and noted its adjudication was not yet complete. (3/24/04 CSR Action Report, ECF No. 168-8, p. 14.) The ICC requested a 90-day extension of Plaintiff's retention in administrative segregation, pending the resolution of the inciting-a-hunger-strike charges. (Pl.'s Undisputed Facts ¶ 34.)

Plaintiff next appeared before the ICC on August 25, 2004, and Defendant Frauenheim participated in the meeting. The ICC noted the guilty finding on the charge against Plaintiff of "Inciting a Hunger Strike." The ICC further noted Plaintiff's disciplinary history, his history of gang involvement, and his admitted role as a leader among inmates.[5] The ICC elected to retain Plaintiff in administrative segregation on Segregated Housing Unit ("SHU") status, to assess and impose an expected 12-month term, and to transfer Plaintiff to another institution. (Pl.'s Undisputed Facts ¶ 38.)

The CSR did not approve Plaintiff's transfer to the SHU because of issues with the RVR pertaining to the "Inciting a Hunger Strike" charge. (Pl.'s Undisputed Facts ¶ 39.) Defendant Lloren, as the Senior Hearing Officer ("SHO"), inadvertently included a first draft of the "Findings" section with the final version of the RVR that was submitted to his supervisor for review. (Decl. of Lloren ¶ 8.)  Also, in reviewing the RVR, the CSR noted "(1) two different sets of SHO findings in the RVR; (2) the findings were 'boilerplate in nature'; (3) staff witnesses were denied without a supporting statement by the SHO; [and] (4) [t]he circumstances of the RVR refers to a Confidential Report that is misdated thus the CDC 1030 is not present, nor is the report." (10-20-04 Form CDC 128G, Decl. of

---

moving party in a motion to strike is not precluded by the sham affidavit rule from elaborating upon, explaining, or clarifying prior testimony).

[5]    Plaintiff denies a history of gang involvement and an admitted role as a leader among inmates as mischaracterizations or misrepresentations. (Pl.'s Undisputed Facts ¶ 38.) His cited evidence does not support his denial. Instead, he admits to being found to be an inactive gang associate, and to being involved with leading and organizing the hunger strike. (Pl.'s First Decl. ¶¶ 71-72.) These were the facts considered by the ICC. (8/25/04 ICC Report CDC 128G, Frauenheim Decl., Exh. C, ECF No. 168-8, p. 16.) His objections are overruled.

Frauenheim, Exh. D, p. 18.)

On August 26, 2004, Defendant Hense wrote a letter to Plaintiff's fiancée in response to her correspondence to Jean Woodford, Director of the California Department of Corrections. (August 26, 2004 Letter, ECF No. 198, pp. 135-36.) Among the issues addressed was whether Plaintiff was suffering reprisals for participation in a hunger strike. Defendant Hense wrote that an individual inmate has a right to participate in a hunger strike if he chooses to do so, but it is a rules violation to instigate a group hunger strike, and that Plaintiff had used his position as a MAC representative to pass information regarding and organize the strike. Defendant Hense further wrote that although Plaintiff was asked to communicate with the strike participants in an attempt to resolve the issues being protested in the strike, this was done before information was received that he was one of the organizers of the strike, which was an abuse of his MAC privileges. The letter concludes that not all information about the matter could be disclosed to Plaintiff's fiancée, but Plaintiff was being disciplined for leading a hunger strike. (Id.)

Plaintiff next appeared before the ICC on October 20, 2004. Defendants Wan and Frauenheim participated in that ICC meeting. At that meeting, the ICC addressed the deficiencies in the RVR noted by the CSR, and the fact that the case had been referred to the Chief Disciplinary Officer ("CDO") for review. The ICC vacated the 12-month SHU term and requested an additional 40-day extension of Plaintiff's retention in administrative segregation, pending the review by the CDO. The CSR noted the request, and directed a status update no later than November 19, 2004. After review by the CDO, the RVR was ordered to be re-issued and re-heard. (Pl.'s Undisputed Facts ¶¶ 40-42.)

### D.     Re-issuance of RVR, Re-Hearing, and Outcome of Re-Hearing

In November 2004, the RVR was re-written by Defendant Tripp, reviewed by Correctional Sergeant Gallagher, and classified as a serious offense by Defendant Wan. (Re-issued RVR, Decl. of Field, ECF No. 168-7, Exh. A, p. 7.) Correctional Officer S. Mata was assigned as the investigator for the re-issued RVR. (Pl.'s Undisputed Facts ¶ 43.)

Plaintiff next appeared before the ICC on November 17, 2004, and Defendants Wan and Frauenheim participated in that meeting. (Pl.'s Undisputed Facts ¶ 44.) The ICC noted that the previous RVR had been ordered to be re-issued and re-heard. (Id. at ¶ 45.) The ICC also noted

Plaintiff's history of gang involvement and a confidential memorandum stating that Plaintiff should be viewed as a serious threat to the mainline population. The ICC requested a 90-day extension of Plaintiff's retention in administrative segregation, pending resolution of the newly issued RVR. (Id.)

Plaintiff contends that, sometime in December 2004, he was informed by Defendant Frauenheim that Defendant Adams appointed Defendant Field to a "special review" to determine whether the hunger strike leaders could "legally" be found guilty of the charges against them. (Pl.'s First Decl. ¶ 56-58.) Plaintiff next appeared before the ICC on January 26, 2005. Defendants Lloren and Frauenheim participated in that ICC meeting. The ICC noted that at that time that the re-issued RVR was still in the adjudication process. The ICC further noted its security concern with the fact that Plaintiff had demonstrated leadership skills among the inmate population, and that his release from administrative segregation would lead to additional unrest among the inmates, creating safety and security concerns. The ICC requested a 30-day extension of Plaintiff's retention in administrative segregation to complete the disciplinary process for the RVR. (Pl.'s Undisputed Facts ¶¶ 46-47.)

Defendant Field was assigned as the Senior Hearing Officer for the re-issued RVR. (Pl.'s Undisputed Facts ¶ 43.) Defendant Field was not involved with the hunger strike, with the previous adjudication on the RVR, and was not involved in the investigation of the previous RVR. (Decl. of Field, ECF No. 168-7, ¶¶ 9-13.) Defendant Field also declares that he did not know Plaintiff at this time, (id.), but Plaintiff disagrees, alleging that he knew Defendant Field from making complaints to him regarding his clothing while he was housed in administrative segregation. (Pl.'s Second Decl., ECF No. 191, ¶ 21).

On February 3, 2005, Defendant Field conducted the hearing on RVR Log No. C-04-04-012R, charging Plaintiff with "Inciting a Hunger Strike," which Defendant Field later changed to "Leading a Hunger Strike" after reviewing the file from Officer Mata's completed investigation. (Pl.'s Undisputed Facts ¶¶ 48, 52.) Plaintiff was served with a copy of the new charge on January 27, 2004, and was served with a supplemental confidential information disclosures form notifying him of the evidence being relied upon in support of the new charge. (Id. at ¶ 55.) Defendant Field wrote a hearing report ("2/3/05 Hearing Report") and noted in there that "Leading a Hunger Strike" is a violation of California Code of Regulations, Title 15, § 3005(a), which prohibits inmates from engaging in

behavior that might lead to violence or disorder, or otherwise endangers the facility, outside community, or another person. (Id. at ¶ 49; 2/3/05 Hearing Report, Decl. of Field, ECF No. 168-7, Exh. A, p. 13.)

On the basis of evidence indicating that Plaintiff was one of the organizers of the hunger strike, Defendant Field found Plaintiff guilty of the charge of "Leading a Hunger Strike," (Pl.'s Undisputed Facts ¶ 60), and recommended Plaintiff be transferred to another institution, (Decl. of Field ¶17). Specifically, Defendant Field found that the evidence showed that: (1) more than 100 inmates participated in the hunger strike; (2) Plaintiff had played a leadership role in organizing the hunger strike, and in persuading other inmates to join it; and (3) Plaintiff admitted to taking such a role in the hunger strike, and that other inmates viewed him as a leader. (Decl. of Field ¶15.) Defendant Field also found that Plaintiff had discussed with inmates potential plans to file a class action 602, employ an organized sit-down, and to board-up windows. (2/3/05 Hearing Report, Decl. of Field, ECF No. 168-7, Exh. A, pp. 14-15.) Defendant Field also noted that Plaintiff described the purpose of the strike as to gain the attention of the administration and media, and that the plan was to make the strike last one week, whether or not the inmates' desired results were reached. (Id. at p. 14.) Defendant Field also found that two program modifications, on March 1, 2004 and March 3, 2004, were caused by the strike. (Id. at p. 15.) Defendant Field noted that it was difficult from his position to ascertain how much disorder the strike caused with respect to staffing issues, but given the magnitude, he assumed the staff had to take on additional responsibilities, including additional staff for medical evaluations and inmate escorting. (Id.) Defendant Field detailed the evidence he considered and relied upon, and specifically found that he could not establish the reliability of the source for the Patten Report, and that the information in that report was general and did not support the charge. (Id. at pp. 9-10.) Instead, Defendant Field relied on other evidence.

Defendants allege that the hunger strike resulted in (1) the Medical Department at SATF assigning additional medical staff to assist with the monitoring and evaluating of the medical conditions of the striking inmates; (2) the disposal and waste of meals that were to be issued to the striking inmates; (3) modified program for Facility C; (4) additional custody staff being re-directed from the unaffected Facility C, Yard 2 area to assist with the additional escort and security duties on

Yard 1; and (5) the disruption of programming of non-involved inmates. (1st Adams Decl. ¶ 14; Decl. of Field ¶ 12.) Plaintiff, on the other hand, contends that no medical evaluations were conducted on the hunger strike participants in his building while he was at Facility C, other than the evaluations of the inmates who, like him, were placed in administrative segregation. (Pl.'s First Decl. ¶ 33.) Plaintiff admits that he and other inmates refused food at Facility C, and that he continued to do so for several days while in administrative segregation. (Id. at ¶¶ 32-33.)

Plaintiff further admits that uneaten meals were thrown away. (Id. at ¶ 35.) However, Plaintiff contends that this did not cause significant disorder, since the staff's normal duties include distributing food trays and collecting uneaten food and other trash for disposal. (Decl. of Lloren, ECF No. 168-12, Exh. B, p. 9.) Plaintiff also admits that the Black inmate population in Facility C was on modified program after the hunger strike, including that additional custody staff was required for escort and security duties, (Id. at ¶ 32), but argues that this disruption was not significant since normal program was run during the strike, (Decl. of Lloren, ECF No. 168-12, Exh. B, p. 8).[6] With regards to Defendant Fields' findings, Plaintiff claims there were no plans for any physical confrontations with staff, for any sit-down strike, or to assault staff, and he did not pressure inmates to participate in the hunger strike. (Pl.'s First Decl. ¶ 34.)

Plaintiff next appeared before the ICC on February 23, 2005, and Defendants Hense and Wan participated in that meeting. (Pl.'s Undisputed Facts ¶ 62.) At the meeting, the ICC noted the guilty finding on the re-issued RVR. The ICC further noted Plaintiff's disciplinary history along with his demonstrated leadership skills among the inmates, and determined that Plaintiff's presence in the general population of inmates was a threat to the safety and security of the institution.[7] The ICC elected to retain Plaintiff in administrative segregation, imposed a 12-month SHU term, recommended a transfer to another institution, and referred the matter to the CSR for consideration. (Id. at ¶ 63; 02-

---

[6]   Defendants raise various objections to Plaintiff's contentions about whether other inmates received medical evaluations or accepted meals, and about the staff's disposal of uneaten food. They are overruled, to the extent Plaintiff supports those allegations with declarations based on his personal observations, and other admissible evidence. (Defs.' Objs. to Pl.'s Proposed Evid., p. 4 ¶¶ 9, 11, 13.)

[7]   The parties disagree as to whether Plaintiff's disciplinary history is properly characterized as "extensive" or "minimal," but agree that the ICC considered his disciplinary history.

23-05 Form CDC 128G, Decl. of Hense, ECF No. 168-10, Exh. A, p. 5.)

On March 2, 2005, the CSR approved Plaintiff's transfer to another institution, and on April 5, 2005, he was transferred to California Correctional Institution. (Pl.'s Undisputed Facts ¶¶ 64-65.) On April 20, 2005, Defendant Adams denied Plaintiff's appeal seeking a dismissal of the RVR and reinstatement of his former status, finding the guilty finding appropriate. (Pl.'s Second Decl., ECF No. 191, Exh. O, pp. 21-22.)

### E.      Conditions in Administrative Segregation

Plaintiff was housed in administrative segregation at SATF from February 29, 2004 through his April 5, 2005 transfer to another institution. During that time, SATF's policy was to provide outdoor exercise opportunities three times per week (twice for 4 hours, and once for 2 hours), for a combined total of 10 hours of outdoor exercise per week. Delays and yard processing time frequently extended the outdoor time for up to half an hour on any given day. Plaintiff alleges that there were no indoor exercise facilities. (Pl.'s Second Decl. ¶ 9.) Defendants are inconsistent on whether there were facilities available for inmates to exercise inside. (Compare Decl. of Adams in Supp. of Opp'n to Pl.'s Mot. for Summ. J. ("3rd Adams Decl."), ECF No. 208-3, ¶ 26) (yes), with (Decl. of Schottgen in Supp. of Opp'n to Pl.'s Mot. for Summ. J. ("3rd Schottgen Decl."), ECF No. 208-3, ¶ 10) (no)). Defendant Field asserts that if inmates did not exercise in the yard, they would exercise inside their cell. (Decl. of Field in Supp. of Opp'n to Pl.'s Mot. for Summ. J. ("3rd Field Decl."), ECF No. 208-2, ¶ 10.)

Also during this time, SATF's Operational Procedure No. 100 ("OP 100") permitted inmates the following items of clothing when they went outside: one t-shirt, one pair of boxer shorts, socks, and shoes, and one towel. (Pl.'s Undisputed Facts ¶ 66.) From November 1 through March 1, inmates were also permitted one short-sleeved jumpsuit. (Pl.'s Second Decl. ¶ 12; OP 100, Decl. of Schottgen, ECF No. 168-13, Exh. A, p. 5.) Plaintiff contends that his clothing was made of thin, ill-fitting material, and his shoes would frequently fall off, cause blisters, and were difficult to exercise in. (Pl.'s Second Decl. ¶¶ 10-11.) Plaintiff further contends that during the months when he was only allowed boxers while outside, he experienced undue embarrassment, humiliation, and anxiety because his penis was occasionally exposed. Plaintiff was exposed to rain, wind, or cold on at least thirty

occasions, and the temperatures felt as low as 20 to 30 degrees. (Id. at ¶¶ 13-16.)

Plaintiff contends that as a result of the exposure to inclement weather, he experienced numbness and extreme pain in his extremities and joints, teeth chattering, and deteriorated muscle coordination and mental clarity. He further experienced blue lips, hands, and feet. These symptoms would often continue for several hours after Plaintiff returned to his cell. (Pl.'s Second Decl. ¶¶ 18-19.) Plaintiff spoke to a second watch nurse about his symptoms one day, and she told him he was suffering from hypothermia and should put in a sick call request if his symptoms were present the next morning. (Id. at ¶ 20.) However, Plaintiff's symptoms always vanished by morning, so he never put in any sick call requests. (Id.) Defendants contend that Plaintiff never reported any medical concerns or ill effects resulting from inadequate clothing, based on what is recorded in his relevant medical records. (Defs.' Undisputed Facts ¶ 72.)

Plaintiff contends that he made verbal complaints about the clothing policy to allow protective clothing, including jackets and thermal underwear, to Defendants Schottgen and Field, but they stated it was "policy" and it was not going to change. (Pl.'s Second Decl. ¶ 21.) He further contends that both Defendants observed inmates being placed in and returned from the exercise pens, and were aware of the weather conditions that inmates were exposed to during the Defendants' shifts. (Id. at ¶¶ 25-26.) Defendant Adams also visited the administrative segregation building. These Defendants wore clothing such as jackets, gloves, caps, and coats during the winter months. (Id. at ¶¶ 26-27.) Defendants Adams and Field assert that Plaintiff did not ask them for a jacket during cold weather. (3rd Adams Decl. ¶ 24; 3rd Field Decl. ¶ 7.) Defendants Schottgen asserts that Plaintiff did not ask him for a jacket or thermal underwear during cold weather. (3rd Schottgen Decl. ¶ 8.)

In October or November 2004, Plaintiff and other inmates filed a group grievance, complaining that they were being denied adequate protective clothing in inclement and rainy weather while on the exercise yard. (Pl.'s Undisputed Facts ¶ 67.) Specifically, they complained that they were only allowed one pair of underclothing, one thin pair of pants, one short-sleeved shirt, and one pair of thin slip-on shoes with no arch, when allowed outside for exercise, and that they were not allowed to take the pants and shirt outside prior to November 1, 2004, despite the severity of the weather. (Id.) The grievance was partially granted on January 25, 2005, at the First Level of Review, regarding the

inmates' complaints about their inadequate shoes, but the request for additional clothing was denied. (Id. at ¶ 68.)

On or about March 11, 2005, Defendant Adams reviewed the grievance at the Second Level of review. He found that the shoes with arches had been provided, and otherwise determined that OP 100 would be adhered to when allowing the inmates to access to the SATF administrative segregation unit. (Pl.'s Undisputed Facts ¶ 69.) The inmates appealed, and on June 2, 2005, at the Director's Level, the appeal was partially granted, in that the Director ordered the SATF to contact the ISU of CDCR to review OP 100 to determine whether it was in compliance with all Title 15 requirements. (Id.)

Defendants contend that, other than the concerns about the inmates' shoes which were addressed and corrected, none of the officials who reviewed Plaintiff's grievance found that SATF's OP 100 was not being complied with, or that Plaintiff was not being allowed sufficient clothing. (Decl. of Adams ¶¶ 24; Decl. of Field ¶ 23; Decl. of Schottgen ¶ 12.) Plaintiff disputes this allegation, and instead contends that the ISU found that OP 100 was not in compliance with CDCR policy regarding appropriate attire for inmates in inclement weather, and that the policy required modifications. (Pl.'s Undisputed Facts ¶ 70.) In support, Plaintiff submits a version of OP 100 modified as of December 2005, stating that in addition to the above-discussed articles of clothing and items allowed to inmates on the exercise yard, jackets will also be made available upon the inmate's requests when the temperature outside is 60 degrees or below, and adding that inmates will be properly attired for the weather conditions. (Pl.'s Request for Judicial Notice in Support of Opp'n to Defs.' Mot. for Summ. J., ECF No. 193, Exh. B, p. 20.) Plaintiff also submits records regarding findings by Captain Lopez of the ISU, stating in pertinent part that Captain Lopez felt that OP 100 should be further modified to be more general, such as to allow jackets to be issued upon request instead of only being used when the temperature is below 60 degrees. (Inmate Appeals Office Modification Order, Pl.'s Second Decl., Exh. U, p. 51.)

Plaintiff contends that the original version of OP 100 was approved and implemented by Defendant Adams on February 17, 2004, (Pl.'s Request for Judicial Notice in Support of Opp'n to Defs.' Mot. for Summ. J., ECF No. 193, Exh. A, p. 17), and Defendants Schottgen and Field were responsible for overseeing and implementing that policy as lieutenants in the administrative

segregation unit, (Id. at p. 5). According to Defendant Adams, the implementation of the clothing policies would be carried out by the officers on duty in the units. (Decl. of Adams ¶ 25.)

## IV.    Analysis

### A.    Claims for Retaliation in Violation of First Amendment

Plaintiff argues that the uncontested facts show that his placement in administrative segregation, retention there, and transfer to California Correctional Institution were done by Defendants Adams, Hense, Ward, Clark, Fulks, Wan, Frauenheim, Lloren, Field, and Tripp in retaliation for him exercising his First Amendment rights. (ECF No. 19.) Specifically, Plaintiff argues that he was penalized for the following conduct: (1) participating in, and assuming a leadership role, in the hunger strike, including by helping to organize the hunger strike, contacting the media, obtaining outside support, advocating for the hunger strike, acting as a spokesperson for the participants, and attempting to organize a picket of the prison; (2) presenting grievances; (3) jailhouse lawyer activities, including providing legal assistance to inmates and by representing inmates as a MAC representative. (ECF No. 28, pp. 28-29.)

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (internal citation omitted). Defendants argue that Plaintiff cannot show that the actions he complains of were based on, or because of, his exercise of his First Amendment rights. Instead, they argue that the uncontroverted evidence shows that each of their actions was taken because of legitimate concerns about the safety and security of the institution. Defendants further argue that because the actions Plaintiff complains of were taken by groups or committees, he cannot link the actions to any individual Defendant. Thus, Defendants argue, summary judgment should be granted in their favor on Plaintiff's First Amendment retaliation claims. (ECF No. 168-1, pp. 9-16; ECF No. 208, pp. 12-13.)

///

///

20

**1.     Plaintiff's Placement in Administrative Segregation**

Defendants first argue that Plaintiff has not presented sufficient evidence to show a genuine issue of material fact regarding whether he was placed in administrative segregation on February 29, 2004 due to retaliation. To prevail on a First Amendment retaliation claim, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." Brodheim v. Cry, 574 F.3d 1262, 1271 (9th Cir. 2009) (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)). To show the presence of this element on a motion for summary judgment, Plaintiff must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to the prison officials' intent" when placing him in administrative segregation. Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003). Plaintiff must provide direct or circumstantial evidence of a defendant's alleged retaliatory motive. McCollum v. CDCR, 647 F.3d 870, 882-83 (9th Cir. 2011). In addition to demonstrating a defendant's knowledge of the protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) the defendant's expressed opposition to the protected conduct; or (3) other evidence showing that the defendant's reasons for the challenged action were false or pretextual. McCollum, 647 F.3d at 882 (quoting Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002)). See also Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) ("[T]iming can properly be considered as circumstantial evidence of retaliatory intent."); Bruce, 351 F.3d at 1289 (statements and suspect timing raised triable issue of fact regarding whether the defendants' motive behind plaintiff's gang validation was retaliatory).

Here, Plaintiff has presented evidence that he and a group of inmates began a hunger strike in protest of prison conditions and in support of inmate grievances. During the hunger strike, Plaintiff, as a MAC representative, was taken to meet with Defendants Fulks and Wan, who discussed the strike, the basis for the strike, and grievance matters. Defendants Fulks and Wan conferred with Defendant Clark, and Defendant Fulks then urged Plaintiff to end the strike, or Plaintiff would suffer "repercussions." Following Plaintiff's refusal to do as requested, Defendants Fulks, Adams, Clark, and others allegedly met and conferred, after which Defendant Fulks told Plaintiff that the prison officials were "going to turn it up a notch." Plaintiff was then ordered to be placed in administrative

segregation, and statements were made to the other striking inmates regarding potential actions to be taken against them as well, unless they ceased striking. When taken as true, Plaintiff's evidence concerning the discussions and requests made of him, paired with the alleged veiled threats and their timing related to the actions taken against him, could be reasonable construed by a jury as circumstantial evidence of retaliation.[8]

Defendants argue that even if the above events occurred as Plaintiff alleges, it does not refute their evidence that Plaintiff was placed in administrative segregation based on legitimate safety and security concerns that he was involved in a conspiracy to assault staff. For a First Amendment retaliation claim in the prison context, the plaintiff bears the burden of proving "the absence of a legitimate correctional goal for the conduct of which he complains." Pratt, 65 F.3d at 806 (citing Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985)). "[A] plaintiff creates a genuine issue of material fact on the question of retaliatory motive when he or she produces . . . evidence that the defendant's proffered reason for the adverse action was false or pretextual." Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009). Here, Plaintiff's evidence and theory that the conspiracy allegations against him were fabricated, if credited, undermines Defendants' argument that there was a legitimate, safety and security-based reason for their actions.

According to Defendants, the confidential information about the conspiracy allegations relied upon to place him in administrative segregation were documented in the Patten Report. Plaintiff has cited records stating, however, that the Patten Report was not in existence until several weeks after he was placed in administrative segregation, and it was dated March 9, 2004, after his placement began. Plaintiff further relies on the undisputed fact that the investigation ultimately concluded that there was insufficient evidence to substantiate any conspiracy charge against him, and cites this as further evidence suggesting the conspiracy allegations were falsified. Taken together and construed in the

---

[8]     Defendants have not argued whether, in a prison context, a hunger strike protesting conditions of confinement and prison policies qualifies as protected speech under the First Amendment. For the limited purposes of addressing whether there is a material factual dispute here regarding whether Plaintiff was retaliated against for the hunger strike, the Court will assume that Plaintiff was engaged in protected activity. See e.g., Arredondo v. Drager, No. 14-CV-04687-HSG, 2016 WL 3755958, at *7 (N.D. Cal. July 14, 2016) ("A hunger strike that is intended to convey a particularized message and has a high likelihood of conveying that message is therefore speech protected by the First Amendment.")

light most favorable to Plaintiff, the evidence he relies upon creates a triable issue of fact regarding whether the conspiracy allegations against him were fabricated after the fact to justify his placement in administrative segregation.

In their reply to Plaintiff's opposition, Defendants argue that they have an explanation refuting Plaintiff's theory. They contend that the confidential information documented in the Patten Report was initially submitted verbally from that officer to his supervisor, Lieutenant Smith, who in turn reported the allegations to Defendant Fulks, who then finally reported the allegations to Defendant Adams. (ECF No. 207, pp. 9-11.) Defendant Adams then immediately acted on these verbal reports and directed Defendant Fulks to place Plaintiff in administrative segregation, and Defendant Fulks complied. The Patten Report was allegedly prepared several days later as a formal record of the confidential information, and was given a later date because of the time needed to complete the write-up. Defendants submitted declarations supporting these contentions from Defendants Adams and Fulks, and from non-parties Lieutenant Smith and (now former) Officer Patten. (2nd Adams Decl., ECF No. 207-1, ¶¶ 4-7; Decl. of Fulks in Supp. of Defs.' Reply, ECF No. 207-4, ¶¶ 5-9; Decl. of E. Smith, ECF No. 207-7, ¶¶ 5-9; Decl. of Patten, ECF No. 207-5, ¶¶ 4-7, 10.)[9]

Based on Defendants' additional evidence, they argue that Plaintiff's theory that the conspiracy allegations against him were falsified falls apart, and summary judgment should be granted in their favor. The Court disagrees. A reasonable jury could chose to disbelieve all of Defendants' evidence in support of their allegations regarding their motivations or intent behind their actions. This includes the testimony of Defendants Adams and Fulks, Lieutenant Smith, and Officer Patten that is meant to

---

[9]     Plaintiff moves to strike the portions of Defendant Adams' declaration regarding these matters as a sham affidavit. He argues that Defendant Adams' testimony contradicts his prior responses to certain discovery requests, in which he stated he did not recall certain events on February 27-29, 2004, and did not recall certain other information. (ECF No. 223, pp. 7-8.) Thus, he asserts that this new contradictory testimony was generated merely to create a material dispute of fact.

This motion to strike is denied. The Court has reviewed the discovery responses Plaintiff argues are inconsistent with Defendant Adams' declaration. (ECF No. 198, p. 47, ECF No. 218, pp. 36-44.) These discovery requests did not seek information from Defendant Adams regarding whether information was reported to him from his staff regarding Plaintiff's role in a conspiracy to assault staff. Defendant Adams' responses indicate a lack of memory or knowledge about other matters. Thus, there is no inconsistency, and no grounds to strike these portions of Defendant Adams' declarations. Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting Van Asdale, 577 F.3d at 998-99) (the inconsistency between a party's prior testimony and subsequent affidavit must be "clear and unambiguous" to justify striking the affidavit).

clarify the issues Plaintiff raised regarding the Patten Report. Plaintiff's theory that the conspiracy allegations were fabricated encompasses the possibility that this additional evidence was also fabricated to buttress Defendants' arguments and allegations.

The Court is mindful of the seriousness of the safety and security concerns regarding a possible conspiracy to assault staff that Defendants contend were the motivating factors behind Plaintiff's placement in administrative segregation. The foregoing analysis does not imply anything concerning the credibility of any party's evidence in this matter. The Court rules, however, that the determination of what motivated Defendants' actions, and whether there were legitimate penological reasons for the conduct alleged to be retaliatory here, depends on making credibility determinations about evidence which is the crux of a significant factual dispute here. These findings are not amenable to determination on summary judgment; instead, the question of whose evidence is more credible, and whose theories about the evidence are more persuasive, must be determined by a finder of fact.

Defendants' next argument on this issue is that Plaintiff cannot state a claim against any of the Defendants because he cannot show that any of them unilaterally had the power to have him placed in administrative segregation. To succeed on his claims, Plaintiff must demonstrate that each Defendant had a role in causing his placement in administrative segregation through their individual actions. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (section 1983 plaintiff must demonstrate that each government-official defendant, through their own individual actions, violated the Constitution); see also Lemire v. California Dept. of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013) (supervisor may be held liable for personal involvement in constitutional deprivation, or where there is a sufficient causal connection between the supervisor's unlawful conduct and the constitutional violation). But Plaintiff is not required to prove that any one Defendant caused his placement in administrative segregation by acting alone. Defendants provide no authority suggesting such, nor has the Court found any such authority. Such a rule would be also be unreasonable, as it would protect wrongful acts by prison officials whenever they conspired to retaliate against an inmate together in ways that they did not have the power to do alone.

In this case, Plaintiff has provided sufficient evidence to create a triable issue of fact regarding whether Defendants Adams, Fulks, and Clark, acting with an alleged retaliatory motive in having him

placed in administrative segregation on February 29, 2004. Defendant Adams' own declaration asserts that he instructed his staff to have Plaintiff placed in administrative segregation, and the uncontroverted facts also show that Defendant Fulks followed such orders and approved the appropriate paperwork for that placement in his role as Acting Associate Warden. Plaintiff further submitted evidence that Defendant Clark, an Associate Warden, participated in the alleged meeting with Defendants Adams and Fulks during which, giving Plaintiff the benefit of every reasonable inference, those parties allegedly discussed Plaintiff's role in the hunger strike and determined to retaliate against him by having him placed in administrative segregation on false allegations.

Plaintiff has not provided evidence that any other Defendant had a role in Plaintiff being placed in administrative segregation on February 29, 2004. Plaintiff argues that Defendant Wan is culpable because he was involved in having Plaintiff placed in administrative segregation. He relies on Defendant Wan's 4/2/04 Report, in which Wan recorded general information about the hunger strike. This does not show that Defendant Wan was involved in causing Plaintiff's placement in administrative segregation for the conspiracy-to-assault-staff allegations, or that he had any knowledge of the alleged falsification of those allegations. Although the report discusses that Plaintiff was placed in administrative segregation, it does not discuss any specific role by Defendant Wan in Plaintiff's placement, and instead only reports facts about the hunger strike, inmates, and staff generally. (Decl. of Wan, Exh. A, ECF No. 168-17, p. 10.) Thus, the 4/2/04 Report does not support Plaintiff's argument.

Based on the foregoing, Plaintiff has sufficiently raised a genuine issue of material fact regarding whether Defendants Adams, Fulks, and Clark retaliated against him for his participation in the hunger strike by having him placed in administrative segregation, in violation of the First Amendment. This precludes summary judgment on these claims.

### 2.      Plaintiff's Retention in Administrative Segregation Through July 2004

Next, Defendants argue that Plaintiff has not presented evidence that his retention in administrative segregation was for any reason other than legitimate correctional reasons. From the time Plaintiff was placed in administrative segregation until July 2004, Defendants contend that Plaintiff was retained there pending the investigation into the allegations that he was involved in a

conspiracy to assault staff. Defendants Adams, Fulks, and Wan were periodically updated on the results of the investigation, and Defendants Ward, Wan, and Frauenheim participated in the meetings where it was decided to retain Plaintiff in administrative segregation pending that investigation.

A supervising prison official may be held liable for "knowingly refus[ing] to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict a constitutional injury." Dubner v. City & Cnty. of San Francisco, 266 F.3d 959, 968 (9th Cir. 2001). Here, Plaintiff does not dispute that there was an investigation conducted on the conspiracy allegations until March 2004. Plaintiff also does not materially dispute that the investigation was formally concluded by the issuance of a Form 128-B in July 2004. Nevertheless, if in fact Defendants knew these allegations were false, then those Defendants cannot assert that there was a valid penological purpose in holding Plaintiff in administrative segregation pending an investigation into fabricated allegations. As noted above, Plaintiff has presented sufficient evidence to create a genuine dispute of material fact regarding whether Defendants Adams, Fulks, and Clark were involved in fabricating false allegations of a conspiracy to assault staff against Plaintiff. Therefore, their inaction in allowing him to be allegedly unnecessarily retained in administrative segregation due to those allegations is at issue here. Plaintiff has further created a material issue of fact regarding whether the investigation should have been concluded sometime in or around March 2004, and thus whether he was allowed to be wrongfully held for several more months as an additional retaliation against him.

Finally, there is no dispute that Defendants Wan, Ward, and Frauenheim were involved in ICC meetings in which it was determined that Plaintiff would be held in administrative segregation pending the investigation into the conspiracy-to-assault-staff allegations. But Plaintiff has not presented a triable claim against those Defendants here, since he has presented no evidence that creates a genuine issue of material fact regarding whether any of those Defendants knew the conspiracy allegations were (allegedly) fabricated. The agreed facts are that at each of the ICC meetings on March 10, 2004, April 14, 2004, and May 26, 2004, the ICC committee members (including Defendants Wan, Ward, and Frauenheim) found the investigation to be ongoing, and elected to retain Plaintiff in administrative segregation pending that ongoing investigation. Thus, Plaintiff has not provided sufficient evidence from which a reasonable jury could conclude that there was a retaliatory motive, rather than a

26

legitimate correctional purpose, for those Defendants to acquiesce to his retention in administrative segregation.

Nor has Plaintiff presented any evidence that Defendants Wan, Ward, or Frauenheim knew that the investigation into these allegations had in fact been completed by March 2004, except for the formal issuance of a Form 128-B. As described in the summary of undisputed and disputed material facts, above, there is evidence that Defendant Adams knew the investigation was completed by March 2004, since he received a report of that information. However, there is no evidence regarding other Defendants being apprised of this specific information. Thus, despite their participation in ICC meetings, there is no triable claim against Defendants Wan, Ward, or Frauenheim here.

### 3.    Continued Retention and Discipline for Hunger Strike Charges

The parties agree that by the time Plaintiff appeared before the ICC in August 2004, there was insufficient information to substantiate a charge of a conspiracy to assault staff against Plaintiff, but he had been charged with inciting a hunger strike. Defendants contend that Plaintiff was then retained in administrative segregation pending the resolution of those charges. Defendants further contend that Plaintiff was found guilty of those charges and punished not for any protected conduct, including participating in a hunger strike, but instead for being a threat to the safety and security of the institution.

Plaintiff argues that there is a material factual dispute here as to whether he was retained in administrative segregation and disciplined in retaliation for protected conduct. In support of Plaintiff's position that he was engaged in protected conduct of which Defendants were aware and retaliated against him for, he cites numerous facts. These include Defendants' knowledge of his participation in the hunger strike, including his presentation of inmate grievances and complaints as a MAC representative and representative of the strike members, and the "peaceful" nature of the strike. Plaintiff also cites references in Defendant Tripp's April 13, 2004 RVR to Plaintiff's participation in the hunger strike, including his statements about obtaining media attention for the strike, the plan by the inmates to file a class action inmate appeal as part of the hunger strike, and the references to Plaintiff's instructions to his fiancée to organize a picket at SATF on February 29, 2004. Plaintiff also relies on his testimony that during at least two ICC meetings in which his retention was discussed, the

prison officials obliquely mentioned his jailhouse lawyer activities. Plaintiff also disputes that Defendants acted with a legitimate penological purpose in punishing him for his role in the hunger strike, based on his arguments that the strike was "peaceful" and the institutional disruptions were minimal. In support, Plaintiff cites his testimony about the lack of medical evaluations conducted on the strike participants while he was on Facility C, that the disposal of uneaten meals was within the staff's normal duties, that normal program was run during the strike, and that there were in fact no plans to incite any physical confrontations with staff or assault staff.

As described in detail above, Plaintiff has presented evidence from which a reasonable jury could determine that Defendants Adams and Clark retaliated against him for his protected conduct. Defendants admit that the information in the RVR was relayed to Defendant Adams. (ECF No. 207, p. 10.) As to Defendant Adams' adverse conduct against him, Plaintiff declares that he was told by Defendant Frauenheim that Defendant Adams held staff meetings at which Plaintiff's case was discussed and at which it was determined Plaintiff would be found guilty, receive a SHU term, and be transferred. (Pl.'s First Decl. ¶ 51). Plaintiff also cites Defendant Adams' denial of Plaintiff's appeal to overturn the RVR guilty finding and reinstate his status. Regarding Defendant Clark, the April 13, 2004 RVR was discussed at an ICC meeting in which Defendant Clark participated in and took part in determining that Plaintiff should be retained in administrative segregation.

Regarding Defendants' argument that their actions here were taken not due to Plaintiff's protected activity, but due to legitimate correctional reasons, Plaintiff has sufficiently raised a triable issue as to that matter for Defendants Adams and Clark. Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283–84 (1977). The question presented by the evidence here is why Plaintiff was retained in administrative segregation and eventually punished for the hunger strike charges. Defendants rely on an argument that their conduct was based on the threat that Plaintiff allegedly posed to the institution, but Plaintiff has presented evidence that Defendants Adams and Clark were, in reality, motivated by their alleged objections to Plaintiff's protected conduct. Thus, viewing the evidence in the light most favorable to Plaintiff, he has presented a triable issue of fact as to whether Defendants Adams and

Clark retaliated against him for protected conduct, or whether they acted to advance a legitimate penological goal. Contrary to Plaintiff's position in his cross-motion for summary judgment, however, he has not established a lack of a material factual dispute as to whether Defendants' intent was non-retaliatory. Rather, the question of Defendants' intent here is a jury question, and neither party is entitled to summary judgment on the claims here involving Defendants Adams and Clark.

On the other hand, Plaintiff has not presented any evidence from which a reasonable finder of fact could infer that any other Defendant took an adverse action against him related to the hunger strike charges with a retaliatory motive, as necessary to survive summary judgment here. Retaliation is not established by simply showing protected conduct followed by adverse activity by a defendant; a plaintiff must show a nexus between the two. See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000). In this case, Plaintiff has presented evidence that several other Defendants knew of his protected conduct, including Defendant Tripp, who wrote the RVR, and Defendants Clark, Frauenheim, Wan, Lloren, and Hense, who participated in ICC meetings where the RVR was discussed. But Plaintiff has presented no evidence showing that any of these Defendants had an intent to retaliate against Plaintiff for the protected conduct, such as any evidence that suggests these Defendants were opposed to the conduct.

Plaintiff does attempt to present evidence that the non-retaliatory, legitimate penological reasons given in the RVR for the hunger strike charges were false. This includes his testimony that the strike was minimally disruptive, and that it did not include all the stages alleged in the RVR. However, these matters were reported in the RVR, and were substantiated by various sources other than Plaintiff. That Plaintiff denies these matters does not refute that Defendants Tripp, Clark, Frauenheim, Wan, Lloren, and Hense relied on them, or show any reason why they did or should have thought these matters were false, when they engaged in the challenged conduct here. Plaintiff also relies on his testimony that comments were made during at least two of the ICC meetings that he understood to refer to his jailhouse lawyer activities. This does not provide sufficient evidence of any retaliatory motive, as Plaintiff's description of the statements is vague, and he does not link the statements to any particular person, much less any particular Defendant. Finally, with respect to Defendant Hense, Plaintiff cites her August 27, 2004 letter to Plaintiff's fiancée as evidence of her retaliatory motive

based on his representation of inmates as an elected MAC representative. However, in that letter Defendant Hense specifically states that an inmate has a right to participate in a hunger strike, and that Plaintiff was asked to use his MAC privileges to act as a liaison during the strike. However, his use of his MAC privileges to instigate or lead the strike was, for reasons Defendant Hense could not fully disclose, a rules violation and the subject of disciplinary charges. This does not show any disagreement by Defendant Hense with Plaintiff's representation of inmate concerns and grievances through MAC, and it is generally consistent with the RVR. In short, Plaintiff's only evidence of a retaliatory motive for Defendants Tripp, Clark, Frauenheim, Wan, Lloren, and Hense is that they knew of his protected activity, and he provides no evidence from which a reasonable jury could infer that his protected activity motivated their conduct. Thus, he has failed to raise a genuine issue of fact regarding whether Defendants Tripp, Clark, Frauenheim, Wan, Lloren, and Hense retaliated against him for protected conduct.

Plaintiff also argues that he has presented sufficient evidence that Defendant Field retaliated against him, because Defendant Field conducted the hearing on the re-issued RVR, found Plaintiff guilty, and recommended his transfer to another institution. Although these activities show Defendant Field was aware of Plaintiff's protected conduct, and took adverse actions against him, Plaintiff does not present sufficient evidence of any retaliatory motive by Defendant Field. That he denies some of Defendant Field's findings does not undermine the fact that Defendant Field relied on other, uncontroverted evidence to find that Plaintiff organized and planned a mass demonstration, which included discussions of plans to divert staff, engage in a disruptive sit-down, and board-up windows, disrupt the institution for a week, whether or not the inmates' desired results were reached, and which actually caused program modifications. Disciplining inmates who are responsible for these matters is reasonably related to the legitimate correctional goal of preserving inmate safety and prison security. See Beards v. Banks, 548 U.S. 521, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006). Thus, Plaintiff has not presented a triable retaliation claim against Defendant Field.

### 4.     Summary of First Amendment Retaliation Claims

Overall, based on the foregoing discussion, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Defendants Adams, Fulks, and Clark retaliated against him in

1    violation of the First Amendment. Thus, Defendants are not entitled to summary judgment on those

2    claims. These genuine issues of material fact also preclude summary judgment being granted to

3    Plaintiff here, despite his contentions to the contrary. Plaintiff has not provided sufficient evidence to

4    raise a triable issue as to whether Defendants Hense, Ward, Wan, Frauenheim, Lloren, Field, or Tripp

5    retaliated against him in violation of the First Amendment. Therefore, Defendants' motion for

6    summary judgment on those claims is granted.

7         **B.    Claims for Violation of Fourteenth Amendment Due Process Rights**

8         Defendants next argue that they are entitled to summary judgment on Plaintiff's claims against

9    Defendants Adams, Hense, Ward, Clark, Fulks, Wan, Lloren, Field, and Tripp for failing to provide

10   fair notice of prohibited conduct before taking/enforcing disciplinary action, and Plaintiff's claim

11   against Defendant Field for failing to act as an impartial fact finder, in violation of the Due Process

12   Clause of the Fourteenth Amendment.[10] (ECF No. 168-1, pp. 16-20.)

13        **1.    Failure to Provide Fair Notice**

14        Plaintiff was charged with and found guilty of leading a hunger strike in violation of 15 CCR §

15   3005(a). 15 CCR § 3005(a) provides:  "Inmates and parolees shall obey all laws, regulations, and local

16   procedures, and refrain from behavior which might lead to violence or disorder, or otherwise

17   endangers facility, outside community or another person." Plaintiff argues that this "catch all" prison

18   regulation did not provided adequate notice that his conduct in organizing and leading a hunger strike

19   qualifies as "behavior which might lead to violence or disorder." Therefore, he argues that 15 CCR §

20   3005(a) was unconstitutionally vague as it was applied to him.

21        A statute or regulation violates the Due Process Clause and is void for vagueness "if it fails to

22   give adequate notice to people of ordinary intelligence concerning the conduct it proscribes or if it

23   invites arbitrary and discriminatory enforcement." United States v. Doremus, 888 F.2d 630, 634 (9th

24   Cir. 1989). In an as-applied challenge, "a statute is void for vagueness . . . if the statute (1) does not

---

[10]     The Court previously found that it was uncertain whether Plaintiff stated a cognizable claim in the third amended complaint against Defendant Field for failing to act as an impartial fact finder during the disciplinary process in violation of the Due Process Clause of the Fourteenth Amendment. (ECF No. 20, pp. 1-2.) For purposes of the parties' summary judgment motions, the Court will assume that Plaintiff stated such a claim.

define the conduct it prohibits with sufficient definiteness and (2) does not establish minimal guidelines to govern law enforcement." United States v. Shetler, 665 F.3d 1150, 1164 (9th Cir. 2011) (internal quotation marks omitted). Courts consider whether a statute is vague as applied to the particular facts at issue, since a plaintiff who "engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 2718-19, 177 L. Ed. 2d 355 (2010) (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)).

Here, Plaintiff's claim of vagueness lacks merit. Among the findings that Defendant Field expressly relied upon to find Plaintiff guilty of violating 15 CCR § 3005(a), according to the 2/3/05 Hearing Report on the charges against him, was that: (1) Plaintiff was involved in organizing a hunger strike of over 100 inmates; (2) Plaintiff had discussed with other inmates a planned sit-down and boarding-up windows; (3) Plaintiff planned for the strike to cause disruption at the institution for a week, regardless of whether the inmates' desired results were reached; (4) Plaintiff sought to gain the attention of both the administration and the media; and (5) two program modifications were caused by the strike on March 1, 2004 and March 3, 2004. Although Plaintiff denies some of these matters, he raises no material factual dispute regarding the evidence that Defendant Field relied upon. That evidence included reports by correctional officers and investigators discussing information learned from confidential sources, from Plaintiff himself, evidence from the hearing testimony, program modification notes, logs, and other sources. (Decl. of Field, ECF No. 168-7, pp. 14-15.)

Organizing a strike involving a significant number of inmates with the purpose of causing disorder for a week no matter the consequences clearly presents a safety concern and disrupts the order of the prison. It is reasonably foreseeable to a person of ordinary intelligence that actions such as boarding-up windows which prevents staff from observing inmates, and having over 100 inmates engage in a mass sit-in, might lead to confrontations among staff and inmates, or potential injuries. Thus, a reasonable person of ordinary intelligence would understand that Plaintiff's acts here are clearly prohibited by 15 CCR § 3005(a), as behavior that may lead to violence or disorder, or otherwise endangers the facility, outside community, or another person. Plaintiff's vagueness claim on

this issue therefore fails, as he had undisputedly engaged in some conduct that is clearly proscribed by the regulation at issue here. Humanitarian Law Project, 561 U.S. at 20, 130 S. Ct. at 2719 ("[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice."). Plaintiff's additional arguments that 15 CCR § 3005(a) is unconstitutionally vague on its face also fail, since Defendants successful showing that the regulation is validly applied to the circumstances in this action precludes a finding that the regulation is invalid on its face. United States v. Kaczynski, 551 F.3d 1120, 1125 (9th Cir. 2009) (quoting Lanier v. City of Woodburn, 518 F.3d 1147, 1150 (9th Cir. 2008)) (a generally applicable statute is not facially invalid unless the statute "can never be applied in a constitutional manner").

Plaintiff's arguments as to whether hunger strikes generally cause disorder in prisons are irrelevant, since his admitted and charged conduct is proscribed by the regulation, and therefore he is precluded from basing his due process claim on hypothetical situations. Humanitarian Law Project, 561 U.S. at 18-19, 130 S. Ct. at 2718-19. Likewise, Plaintiff's argument that some of his conduct was permissible and does not violate the regulation, such as refusing food for himself, misses the point that there is undisputed conduct here that clearly violated the regulation. The same is true of Plaintiff's arguments based on certain disputed allegations, such as that he did not observe medical evaluations of the other hunger strike participants, or that some of the other disruptions described by Defendants seemed minimal. Even if these factual disputes are found to be as Plaintiff describes them, that does not refute the agreed facts described above. The circumstances of this action are also distinguishable from the case that Plaintiff relies upon, in which there was only evidence of a refusal of meals, which was not held sufficient to support a guilty finding under 15 CCR § 3005(a). In re Gomez, 246 Cal. App. 4th 1082, 1099, 201 Cal. Rptr. 3d 124, 137 (2016) (petitioners refusal to eat nine consecutive meals as part of a hunger strike, standing alone, did not show behavior that might lead to violence, disorder, or endanger the facility, outside community or another person under § 3005(a)).

Plaintiff also argues that 15 CCR § 3005(a) is unconstitutionally vague because it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). Plaintiff has not provided any evidence that any arbitrary or discriminatory enforcement occurred here. He asserts that other people

who participated (but were not leaders) in hunger strikes were not charged with violating 15 CCR § 3005(a), as evidence of arbitrary enforcement. However, this does not show that people who performed the same or similar conduct as Plaintiff in leading a hunger strike, and thus to whom 15 CCR § 3005(a) applied, were not charged, and that Plaintiff was charged, for arbitrary or discriminatory reasons.

Finally, due process also requires that the guilty finding here against Plaintiff be supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985); Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003). The "some evidence" standard requires only that a court determine whether there is "any evidence in the record to support the conclusion." Castro v. Terhune, 712 F.3d 1304, 134 (9th Cir. 2013) (quoting Bruce, 351 F.3d at 1287). "This test is 'minimally stringent.'" Id. (quoting Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994)). Courts do not "examine the entire record, independently assess witness credibility, or reweigh the evidence," id. (quoting Bruce, 351 F.3d at 1287), and the evidence need only bear "some indicia of reliability" to be considered "some evidence," id. (quoting Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990)). As discussed above, there is at least some evidence supporting Defendant Field's guilty finding here, including investigative reports, prison logs, notes of program modifications, and the evidence bears indicia of reliability, including because they are corroborated by other sources, such as admissions from Plaintiff himself, and other pieces of evidence are official prison records which Plaintiff does not dispute. Thus, the guilty finding here is adequately supported by "some evidence" for due process purposes.

### 2.       Impartial Hearing Claim

Defendants next argue that Plaintiff has not presented a triable issue of fact regarding whether his due process rights were violated because Defendant Field was not impartial when adjudicating his re-issued RVR. Prison disciplinary hearings are not criminal in nature and, therefore, the due process guarantees afforded criminal defendants in criminal proceedings do not apply to disciplinary proceedings. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Due process in this context is satisfied if the disciplinary hearing is conducted by a neutral fact-finder and the prisoner is provided advance notice of the charges, an opportunity to call witnesses and present evidence, a statement of the

evidence relied on, and the reasons for the disciplinary action. Id. at 563–66. Administrative adjudicators are presumed to act with honesty and integrity. See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 497–97, 96 S. Ct. 2308, 49 L. Ed. 2d 1 (1976). To overcome this presumption, a prisoner alleging bias "must show that the adjudicator has prejudged or reasonably appears to have prejudged, an issue." Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995) (internal quotations omitted). A prisoner may make this showing in two ways: (1) "[T]he proceedings and surrounding circumstances may demonstrate actual bias on the part of the adjudicator" or (2) "the adjudicator's pecuniary or personal interest in the outcome of the proceedings . . . created an appearance of partiality that violates due process. . . ." Id.

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact regarding whether Defendant Field was not a neutral fact-finder. Defendant Field submitted a declaration stating that he was not involved with the hunger strike, the adjudication of the first RVR, or the investigation of Plaintiff on the re-issued and re-heard RVR. To show bias or the appearance of partiality here and refute this evidence, Plaintiff relies on the evidence that:  (1) Defendant Field was assigned to determine Plaintiff's guilt of the charges against him in December 2004; and (2) Defendant Field subsequently changed the language in the charges against Plaintiff from "Inciting a Hunger Strike" to "Leading a Hunger Strike" in January 2005.

This evidence does not support finding any improper bias or partiality by Defendant Field here. Rather, it merely shows that Defendant Field was assigned to adjudicate Plaintiff's RVR in December 2004, and that his review of the RVR and related reports after Officer Mata's investigation was concluded, caused him to change the wording of the charge against Plaintiff. Plaintiff also admits to being notified of the changes in the charge prior to the hearing. These facts are consistent with Defendant Fields' declaration, and are not suggestive of any partiality or bias.

Plaintiff asserts that Defendant Fields' review of the completed investigative file in advance of the hearing was prohibited, because a prison official who has participated in the case as an investigating or reviewing officer, or who has personal knowledge of the incident, is not sufficiently impartial to preside over the hearing. Clutchette v. Procunier, 497 F.2d 809, 820 (9th Cir. 1974), modified, 510 F.2d 613, and rev'd on other grounds in Baxter v. Palmigiano, 425 U.S. 308, 96 S. Ct.

1551, 47 L. Ed.2 d 810 (1975); see also 15 CCR § 3313(b) ("Staff who review or classify a RVR shall not serve as the disciplinary hearing official for that rule violation."). Plaintiff incorrectly conflates Defendant Fields' review of the investigative file in his role as a hearing officer, with participating in the underlying case itself as an investigative or reviewing officer. Here, the undisputed facts show that the original RVR was reviewed by Correctional Sergeant Gallagher, and then classified as a serious offense by Defendant Schottgen. The re-issued RVR was investigated by Correctional Officer Mata, reviewed by Correctional Sergeant Gallagher, and then classified as a serious offense by Defendant Wan. None of these officers could properly be Plaintiff's hearing officer, but Defendant Field could.

Plaintiff also argues that Defendant Fields' changing of the language in the charges against him itself suggests Defendant Field was not neutral. Plaintiff has not demonstrated that Defendant Field's editing of the name of the charges showed any bias or partiality. The undisputed evidence in this case is that the changed in the name of the charges better matched the evidence to be used against Plaintiff. "The function of a . . . judge includes intervention in order to clarify issues, insure the orderly presentation of evidence and expedite the trial." U.S. v. Trotter, 529 F.2d 806, 814 (3d Cir. 1976). Impartiality is not lost by intervention of the sort shown by the evidence here. Due process does not preclude re-naming the charges against Plaintiff to better fit the evidence against Plaintiff, and to provide him better notice of the charges against which he will have to provide a defense, as was done in this case. See Bostic v. Carlson, 884 F.2d 1267, 1270–71 (9th Cir. 1989) (finding that an adjustment in an incident report to say "possession of contraband" instead of "stealing" did not violate due process under Wolff).[11]

### 3.    Summary of Fourteenth Amendment Due Process Claims

For these reasons explained above, summary judgment is properly granted to Defendants Adams, Hense, Ward, Clark, Fulks, Wan, Lloren, Field, and Tripp on Plaintiff's claim that they failed to provide fair notice of prohibited conduct before taking/enforcing disciplinary action, and to Defendant Field on Plaintiff's claim for failing to act as an impartial fact finder, in violation of the

---

[11]    The opinion of Plaintiff's expert witness, Daniel B. Vasquez, that an officer who reviews the RVR and related reports prior to a hearing and amends the charges in any respect should be presumed to be biased, is inconsistent with the facts in this matter and the law that applies. (Decl. of Daniel B. Vasquez, ECF No. 198, p. 58 ¶ 21.)

Due Process Clause of the Fourteenth Amendment. That is, Defendants are entitled to summary judgment on all of Plaintiff's claims that they violated the Due Process Clause, and Plaintiff's motion for summary judgment in his favor is denied.

### C.    Claims for Inadequate Clothing in Violation of the Eighth Amendment

Defendants also move for summary judgment on Plaintiff's claims that Defendants Adams, Schottgen, and Field failed to provide him with adequate clothing in violation of the Eighth Amendment. (ECF No. 168-1, pp. 16-18.) The parties address Plaintiff's theory regarding this claim as one of deliberate indifference to the conditions of his confinement.

Prison officials "must provide humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832–33, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To succeed on an Eighth Amendment conditions-of-confinement claim, a prisoner must show that (1) the defendant prison official's conduct deprived him or her of the minimal civilized measure of life's necessities (the objective component) and (2) that the defendant acted with deliberate indifference to the prisoner's health or safety (the subjective component). Id. at 834. To show deliberate indifference, the prisoner must establish that the defendant knew of and disregarded an excessive risk to inmate health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official may thus be free from liability if he or she did not know of the risk or took reasonable action in response to the risk. Id. at 844.

Defendants first argue that Plaintiff cannot meet the objective component in this case by showing that he was deprived of a minimal civilized measure of life's necessities. Evidence that a plaintiff was deprived of sufficient clothing to provide warmth, depending on the totality of the circumstances, may be extreme enough to show a violation of the Eighth Amendment. See Wilson v. Seiter, 501 U.S. 294, 304, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Here, Plaintiff has submitted evidence that he was only permitted thin, ill-fitting clothing, sometimes no more than a t-shirt and boxers, when exercising outside in inclement weather. This included being exposed to rain, wind, or cold on at least thirty occasions, with temperatures sometimes as low as 20 to 30 degrees. Defendants who visited the exercise pens at this time wore protective

jackets, gloves, caps, and coats during the winter. Plaintiff has also presented evidence that his exposure to inclement weather with the clothing he was provided resulted in numbness and pain in his extremities and joints, teeth chattering, deteriorated muscle coordination and mental clarity, and blue lips, hands and feet. These symptoms would often last for several hours. This evidence is sufficient to create a triable issue of fact regarding whether Plaintiff was objectively deprived of adequate clothing in violation of the Eighth Amendment. See Walker v. Sumner, 14 F.3d 1415, 1421 (9th Cir. 1994) (exposure to weather conditions during which the deprivation of a jacket inflicted substantial pain may violate the Eighth Amendment); Palmer v. Johnson, 193 F.3d 346, 349 (5th Cir. 1999) (prison officials use of jackets to warm themselves in cold weather while inmates had none is evidence that inmates were exposed to conditions that met the level of a constitutional deprivation).

Defendants' arguments that Plaintiff's evidence of harm is only uncorroborated testimony, and that his medical records do not support his alleged injuries, goes to the credibility of Plaintiff's assertions that he was harmed, and creates a triable issue of fact that precludes summary judgment being granted in his favor. However, Defendants' evidence does not categorically disprove Plaintiff's allegations, and thus does not establish that summary judgment must be granted in their favor as a matter of law. Further, Defendants' argument that the clothing Plaintiff was provided was consistent with the relevant policy at the time, OP 100, does not preclude Plaintiff from being successful on his claim. Whether the Defendants' adherence to OP 100 and refusal to provide additional clothing was objectively reasonable, or rose to the level of a constitutional deprivation, is a question of disputed fact not determinable on summary judgment in this case. This is particularly true here, since Plaintiff has provided evidence that other prison officials found that the policy should be modified, and that it was in fact modified based on Plaintiff's group grievance. See Thomas v. Ponder, 611 F.3d 1144, 1155-56 (9th Cir. 2010) (whether deprivation consistent with prison policy rose to level of constitutional deprivation is a question of the circumstances presented).

Defendants also argue that Plaintiff cannot meet the subjective component of this claim by showing that Defendants Adams, Schottgen, and Field were aware of the risk to Plaintiff's health, and deliberately disregarded it. They contend that Plaintiff cannot succeed on his claims because he could have chosen to stay inside. Thus, to the extent Plaintiff decided to go outside and did not complain that

he wanted to return inside, Defendants had no knowledge of the risk to him from his allegedly inadequate clothing.

On the contrary, Plaintiff has presented sufficient evidence to create a material issue of fact regarding Defendants' awareness of the harm to him, including that he made verbal complaints directly to Defendants Schottgen and Field that went unaddressed, that those Defendants observed the weather conditions directly, that Defendant Adams also visited the administrative segregation building and observed the conditions, and that Defendants wore protective clothing to protect themselves in the cold or inclimate weather. From these facts, a reasonable jury could determine that Defendants Adams, Schottgen, and Field were aware of the alleged lack of adequate clothing provided to Plaintiff, and were deliberately indifferent to the risk of harm from that inadequacy under the conditions. Defendants' testimony that Plaintiff never asked for a jacket or thermal underwear during cold weather creates a genuine dispute of a material fact here which precludes summary judgment being granted to Plaintiff, but it does not entitle them to summary judgment.

For these reasons, summary judgment on Plaintiff's claim against Defendants Adams, Schottgen, and Field based on inadequate clothing in violation of the Eighth Amendment is denied, for Plaintiff and Defendants.

### D.   Qualified Immunity

Finally, Defendants assert that they are protected by qualified immunity in every instance in this case because "not a single Defendant took any action that a reasonable prison official would have believed to be unlawful." (ECF No. 168-1, pp. 22-28.) Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

///

1    The qualified immunity test is two-fold. Under one prong, the court considers whether alleged

2    facts, taken in the light most favorable to plaintiff, show defendant's conduct violated a constitutional

3    right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Under the second prong, the court determines

4    whether the constitutional right was "clearly established." Pearson v. Callahan, 555 U.S. 223, 232

5    (2009). If no constitutional right was violated, defendant is entitled to qualified immunity without

6    further analysis. Hopkins v. Bonvicino, 573 F.3d 752, 762 (9th Cir. 2009) ("If the alleged conduct did

7    not violate a constitutional right, then the Defendants are entitled to immunity and the claim must be

8    dismissed."). Courts in their sound discretion can address the two prongs in any order. Pearson, 555

9    U.S. at 236.

10    Here, the Court has concluded above that Plaintiff has no triable claims for the violation of his

11    Fourteenth Amendment Due Process rights. Thus, the Court need not consider Defendants' entitlement

12    to qualified immunity with regard to those claims.

13    Regarding Plaintiff's Eighth Amendment claims based on adequate clothing, construed in the

14    light most favorable to Plaintiff, he has provided evidence showing he was given insufficient clothing

15    to keep him warm in inclement weather and temperatures as low as 20 to 30 degrees. The deprivation

16    allegedly caused injuries such as numbness and pain in the extremities and joints, blue lips, hands and

17    feet, teeth chattering, and deteriorated muscle coordination and mental clarity. Prison officials have a

18    duty to ensure that prisoners are provided adequate shelter and clothing. Johnson v. Lewis, 217 F.3d

19    726, 731 (9th Cir. 2000). It was clearly established at the time of the events at issue that exposing an

20    inmate to extreme cold without providing clothing would violate the prohibition against cruel and

21    unusual punishment. See Johnson, 217 F.3d at 732–33 (exposing inmates to subfreezing temperatures

22    for several hours without adequate protection is sufficiently serious to violate the Eighth Amendment);

23    see also Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980) (near freezing cell temperatures may

24    allege a constitutional violation). Therefore, Defendants motion for summary judgment on the grounds

25    of qualified immunity is denied for these claims.

26    Whether qualified immunity applies to Plaintiff's First Amendment retaliation claims against

27    Defendants Adams, Fulks, and Clark presents a more complex issue.  The Court has found that there is

28    a genuine issue of material fact regarding whether these Defendants retaliated against Plaintiff due to

his protected activity. Plaintiff has presented evidence that the alleged retaliation may have been motivated by his engaging in a hunger strike, or for other activity, such as the presentation of grievances both written and orally as a MAC representative during the strike. This requires the Court to evaluate whether these activities were clearly established rights for the purposes of qualified immunity.

Whether plaintiff has alleged a violation of a clearly established constitutional right is a purely legal question. "Once a defendant pleads a defense of qualified immunity, '[o]n summary judgment, the judge appropriately may determine not only currently applicable law, but whether the law was clearly established at the time.'" Siegert v. Gilley, 500 U.S. 226, 231, 111 S. Ct. 1789 (1991), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Whether a legal right is "clearly established" is a question of law. Elder v. Holloway, 510 U.S. 510, 516, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994).

In a thoughtful and well-analyzed decision, the district court in Arredondo v. Drager, et al., No. 14-CV-04687-HSG, 2016 WL 3755958, (N.D. Cal. July 14, 2016), faced strikingly similar facts as in the current case before this Court. In the Arredondo case, the plaintiff had engaged in a mass hunger strike. The cognizable claim before the court was a First Amendment retaliation claim that defendant officers retaliated against Plaintiff for engaging in hunger strikes and for filing lawsuits against correctional staff. In ruling on a summary judgment motion, the district court found that there was a genuine dispute of material fact regarding whether an officer had referred to an inmate-plaintiff as a "debriefer" in front of other inmates, risking the plaintiff's safety, in retaliation for the plaintiff "filing lawsuits and being [a] hungerstrike flip-flopper[.]" Id. at *3. In other words, for the same adverse activity, the district court found there was a triable issue regarding whether the plaintiff was being retaliated against for litigation and grievance activity, and for engaging in a hunger strike. Id. at *15.

In analyzing qualified immunity, the district court found that the officer was not entitled to qualified immunity with respect to the plaintiff's claim that the officer retaliated against him for his litigation and grievance activity, because those were clearly established rights at the time of the officer's alleged retaliation. However, the court ruled that the officer was entitled to qualified immunity on the plaintiff's claims that he was retaliated against for engaging in a hunger strike,

because engaging in a hunger strike in the prison setting was not a clearly established right under the First Amendment. Id. at *15-16. The court in Arredondo carefully evaluated case precedent and other persuasive authorities to determine whether engaging in a hunger strike protest is a clearly established right such that an officer would be on notice of such clearly established right. The Arredondo court found that there was a lack of law addressing whether a hunger strike is protected First Amendment speech, including no binding Supreme Court or Ninth Circuit precedent, and that the handful of district court and out-of-circuit cases analyzing this issue, published and unpublished, are inconsistent and inconclusive.

This Court finds the Arredondo district court's discussion and analysis of the law on this issue to be persuasive, and adopts it as if set forth fully herein.[12] Therefore, to the extent Defendants Adams, Fulks, and Clark retaliated against Plaintiff because he engaged in a hunger strike, those Defendants are entitled to qualified immunity, and thus summary judgment is appropriate, on those claims.[13] To succeed on his First Amendment retaliation claims, Plaintiff must prove at trial that those Defendants

---

[12]     The court in Arredondo was troubled, as is this Court, by the competing interests of maintaining security in a penological setting with that of an inmate's Constitutional rights. The clearly established prong is not met where, the relevant First Amendment test charges defendants with balancing competing interests. Devereaux v. Perez, 218 F.3d 1045, 1055 (9th Cir. 2000), on reh'g en banc, 263 F.3d 1070 (9th Cir. 2001) ("The need to subject this abstract substantive constitutional right to a balancing test which weighs the interest of a parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome, especially in light of the requirement that the substantive constitutional right be 'clearly established' at the time of the alleged violation."). In this case, there is undisputed evidence that Plaintiff was engaged in a mass hunger strike, and was found to be a leader of that strike. The strike disrupted the operation of the institution, and while the parties dispute the scope of the disruption, it is undisputed that there was disruption. Courts must also balance the state's legitimate interest in maintaining order in the facility in which the individual is detained, and, where appropriate, defer to the "policies and practices that in th[e] judgment" of prison officials "are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540 (1979) (approving numerous conditions of confinement for pretrial detainees as not violative of First and Fourth Amendments). When balancing the obligation to provide for inmate and staff safety against the duty to accord inmates the rights and privileges to which they are entitled, prison officials are afforded "wide-ranging deference." Bell, 441 U.S. at 547, 99 S. Ct. 1861. In this particular case, the Court need not balance the interests because the Court has concluded that there is not a "clearly established right" of which the prison officials should have known.

[13]     This Court's analysis and holding on qualified immunity would be the same for all defendants alleged to have retaliated against Plaintiff for engaging in the hunger strike—Defendants Wan, Ward, Frauenheim, Trip, Lloren, Hense, and Field. The Court does not analyze qualified immunity specifically for these Defendants because the Court in section IV.A.1-3 found that Plaintiff had not presented triable issues of fact. Had the Court not determined a lack of triable issues, the Court would have nonetheless granted summary judgment to these Defendants on qualified immunity grounds.

retaliated against him, not for the hunger strike, but for other protected First Amendment activity.

**V.      Conclusion and Order**

For the reasons explained, it is HEREBY ORDERED that:

1.      Defendants' motion for summary judgment (ECF No. 168) is GRANTED IN PART AND DENIED IN PART, as set forth above;

2.      Plaintiff's cross-motion for summary judgment, (ECF No. 188) is DENIED in its entirety;

3.      Defendants Adams, Fulks, and Clark are entitled to Qualified Immunity on Plaintiff's First Amendment claim for retaliation for engaging in a hunger strike;

4.      Plaintiff's claims that Defendants Hense, Ward, Wan, Frauenheim, Lloren, Field, and Tripp retaliated against him in violation of the First Amendment, and that Defendants Adams, Hense, Ward, Clark, Fulks, Wan, Lloren, Field, and Tripp violated his Fourteenth Amendment Due Process rights, are DISMISSED;

5.      Defendants Hense, Ward, Wan, Frauenheim, Lloren, and Tripp are DISMISSED from this action;

6.      This action currently proceeds on Plaintiff's claims that:

a.      Defendants Adams, Fulks and Clark retaliated against him in violation of the First Amendment, as described and limited above;

b.      Defendants Adams, Schottgen, and Field failed to provide him with adequate clothing in violation of the Eighth Amendment; and

7.      An order setting a trial date and a schedule for pretrial litigation will issue.

IT IS SO ORDERED.

Dated:   __**July 22, 2016**__                    ___/s/ *Barbara A. McAuliffe*___
                                                                      UNITED STATES MAGISTRATE JUDGE